**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-CR-226-JFH |
| | ) | |
| JAMES SAMUEL EATON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S THIRD MOTION TO SUPPRESS**

James Samuel Eaton, Defendant, through counsel undersigned, pursuant to

Fed. R. Crim. P. Rule 12(b)(3)(C), moves this Court to suppress his statements and

evidence of his silence in violation of his Fourth, Fifth, or Sixth Amendment rights.

Specifically, Mr. Eaton asks this Court to suppress any statements he made or any

other evidence obtained as a result, first, of a custodial interrogation by federal agents

at Mr. Eaton's residence on August 4, 2025; and, second, in connection with his arrest

on November 25, 2025.

Mr. Eaton requests that the Court set an evidentiary hearing regarding this

Motion. Mr. Eaton has not yet had an opportunity to cross-examine witnesses

regarding the facts relevant to this Motion. Mr. Eaton reserves the right, based on the

record that will be developed at the suppression hearing, to raise any and all

arguments, including those pursuant to the Fourth, Fifth, or Sixth Amendments, in

support of suppressing the fruits of the custodial interview that occurred on August 4, 2025 and interrogation after his arrest on November 25, 2025.

To provide the government and the Court with notice of the issues that will be addressed at the hearing, Mr. Eaton advises that he intends to make the following arguments in support of this Motion.

Statement of Facts

According to discovery, this prosecution arose from "a non-specific social media posting" that, on June 9, 2025, came to the attention of Protective Intelligence of the Immigration and Customs Enforcement, a federal law enforcement agency under the purview of the Department of Homeland Security.

On August 4, 2025, three special agents and three task force officers, all with Homeland Security Investigations, supported by Oklahoma Highway Patrol Troopers in a marked patrol vehicle, arrived at the residence that Mr. Eaton shares with his parents in Muskogee, Oklahoma. No advance notice was given that six federal law enforcement officers and additional OHP Troopers would be arriving at the Eaton residence. It is believed that all six of the federal officers were in uniform, wearing body armor and holstered service firearms.

The government version of what happened on August 4, 2025 is told in capsule form by a summary provided by the government in discovery and attached hereto as Exhibit A. The summary gives the names of six federal agents and notes the OHP Troopers' presence. Exhibit A. The summary also makes allegations of what occurred

2

during the encounter, including the following: "EATON did not apologize for making the post and seemed to show no remorse on his intention to incite harm/ hurt ICE agents and Law Enforcement officials carrying out their duties." *Id.*

More details of the government version are provided by testimony at the detention hearing in this case. According to the testifying agent, who was not present on August 4, 2025, Scott Eaton was "verbally uncooperative" and had "told law enforcement that his son was protected by the First Amendment and he could say whatever he wanted on the internet." Detention Hearing Transcript, Dkt. #28, filed December 3, 2025, pp. 40-41. The testimony additionally was that Scott Eaton:

> was not happy with law enforcement being at his house. For example, he
> -- the Defendant was sleeping when law enforcement got there to
> interview him and it was, like, one o'clock p.m. in the middle of the week
> and the father was initially reluctant to go wake the Defendant up to
> have him talk to law enforcement. It took some talking on the part of
> our agents and task force officers to get the father to go get the
> Defendant. And the father was just overall unhappy that the police were
> at his house.

*Id.*, pp. 62-63.

Scott Eaton does not agree with the government's version. Scott Eaton describes HSI Special Agent Kameron Theede as insistent that the agents would speak with Mr. Eaton. Scott Eaton did not feel that he could refuse, and Agent Theede would not explain why he needed to speak to Mr. Eaton. The interaction of the agents with Mr. Eaton and Scott Eaton happened on the porch of the Eaton residence.

Mr. Eaton felt compelled to answer questions, and he made no voluntary statements. He felt intimidated by Agent Theede as well as by the show of force of the number of agents and vehicles. At some point during the questioning, Agent Theede asked how Mr. Eaton felt about his posts. Mr. Eaton said that he did not feel comfortable answering that question. During the questioning, Agent Theede threatened to come back and arrest Mr. Eaton if he did not stop publishing anti-ICE posts. Agent Theede said that Mr. Eaton could be charged with felonies, including domestic terrorism. Mr. Eaton interpreted what Agent Theede said as ordering him to stop his anti-ICE posts "or else." Agent Theede said that they would be watching.

The agents never asked Mr. Eaton if he consented to answer questions. They at no time said that Mr. Eaton had a choice as to whether to speak with them. They at no time said that Mr. Eaton could stop answering questions at any time. They did not say that Mr. Eaton had the right to an attorney before he answered any questions. Mr. Eaton did not consent to the interaction with the agents. He felt he had no choice but to submit to the questioning. He did not believe that he had the option of refusing, retreating inside his home, and going about his business.

On November 25, 2025, an unknown number of agents and vehicles surrounded the Eatons' residence, and a bullhorn was used to alert the occupants of the house to come outside. Mr. Eaton eventually woke up and realized that they were ordering him out of the house, and he went outside. A police dog jumped on him, but did not injure him. He was handcuffed and was told to sit outside. He was asked if

anyone else remained in the house and whether there were any locked doors. Later, he was put in a police vehicle for transport to jail. The officer driving the car asked if he would give the passcode for his phone, and Mr. Eaton replied "no." Mr. Eaton was not advised of his *Miranda* rights.

Argument and Authorities

I.      The law regarding when a person is in custody for Fifth Amendment purposes.

"Police need not administer *Miranda* warnings to everyone they question," and need only give them when a person is in custody and is being interrogated. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008), *citing Miranda v. Arizona*, 384 U.S. 436 (1966). The *Jones* court listed several factors which may indicate "whether police dominate the encounter:"

1. separation of the suspect from family or colleagues who could offer moral support;

2. isolation in nonpublic questioning rooms;

3. threatening presence of several officers;

4. display of a weapon by an officer;

5. physical contact with the subject; and

6.  an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Jones*, 523 F.3d at 1240 (numbered and reformatted for easy reference). The factors are non-exclusive and the "totality of the circumstances" determines the nature of the encounter. *Id.*

5

II.     The preliminary facts indicate that the August 4, 2025 encounter was "the functional equivalent of formal arrest."

Using the *Jones* factors as a guideline, the preliminary facts indicate that the August 4, 2025 encounter was "the functional equivalent of formal arrest" for purposes of application of *Miranda*.

*Jones* Factor 1 would ordinarily weigh against a finding that Mr. Eaton was in custody because his father was allowed to remain with him during the questioning. The ordinary import of this fact, however, is undercut because of the officers had already overborne Scott Eaton's will by commanding him to call Mr. Eaton to the front porch. Scott Eaton found the agents insistent, scary, and intimidating. Therefore, Scott Eaton was not an independent person who felt that he could stand up to Agent Theede and the other officers.

*Jones* Factor 2 may be neutral. The front porch of the Eatons' porch was not a small nonpublic questioning room; however, it was also a small space in which Mr. Eaton literally had his back to the door to his house. Mr. Eaton did not feel that he had the freedom to retreat into his home, and he therefore was forced to face Agent Theede.

*Jones* Factor 3 heavily weighs in favor of a finding of equivalence to arrest. Mr. Eaton was aware that several officers were present along with Agent Theede. They were all in uniform, wearing body armor, and they all appeared to have holstered service firearms. Several vehicles were parked in the Eatons' driveway and in the

6

street. In addition to the show of force, Agent Theede's demeanor and his words were threatening. Mr. Eaton did not feel that he could refuse to listen to Agent Theede's threats and questions. He did not feel that he was free to leave the encounter, retreat inside his home, and go about his business.

*Jones* Factor 4 weighs in favor of a finding of equivalence to arrest because it is believed that all of the multiple officers had holstered weapons. The encounter had the character of an arrest due to the significant show of force.

*Jones* Factor 5 weighs against a finding of equivalence to arrest because there was no physical contact between Mr. Eaton and the officers.

*Jones* Factor # 6 is strongly in favor of a finding that the August 4, 2025 encounter was the equivalent of an arrest. Agent Theede's demeanor and words conveyed that it was mandatory for Mr. Eaton to answer questions. Agent Theede never advised Mr. Eaton that he was free to leave. He never advised Mr. Eaton that he could refuse to answer questions. He never advised Mr. Eaton that he could terminate the encounter at any time. He never advised Mr. Eaton that he had the right to an attorney before he answered any questions.

Because the August 4, 2025 encounter was the equivalent of an arrest and a custodial interrogation, any statements made by Mr. Eaton should be suppressed because the officers violated his Fifth Amendment right by failing to inform him of his *Miranda* rights.

III.    Independent of *Miranda*, Mr. Eaton's statements should be suppressed because they were not made voluntarily.

Independent of whether *Miranda* rights apply, due process requires that any statements that are used as evidence against an individual must have been made "freely and voluntarily." *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020). If a person's "will has been overborne," the use of statements "offends due process." *Id.* at 943. "The government bears the burden of showing voluntariness by a preponderance of the evidence." *Id.* The same factors that were used in the analysis of whether the August 4, 2025 encounter was the functional equivalence of an arrest should be applied in finding that Mr. Eaton did not make the statements during this encounter voluntarily. The atmosphere created by those factors was highly coercive. Mr. Eaton's will was overborne and he complied with what seemed to be commands to answer Agent Theede's questions.

IV.    The August 4, 2025 encounter was not consensual.

The government may argue that the August 4, 2025 encounter was consensual, but the preliminary facts weigh heavily against such a conclusion. One "carefully established exception" to the warrant requirement is a consensual encounter. *Manzanares v. Higdon*, 575 F.3d 1135, 1143 (10th Cir. 2009), *quoting Groh v. Ramirez*, 540 U.S. 551 (2004) (further quotations omitted). A consensual encounter is limited by the scope of the consent given. *Manzanares v. Higdon*, 575 F.3d at 1143.

> [A]s soon as an individual has "an objective reason to believe that he is not free to terminate [an encounter]," he is "seized." As an exception to

8

> the warrant requirement, we take care to "jealously and carefully draw" the boundaries of consent, lest the warrant requirement be subsumed by the exception.

*Id.*, further citations and quotations omitted. The *Manzanares* court went on to explain that consent can be withdrawn at any time. *Id.*

The Tenth Circuit has given guidance regarding when a "seizure" has occurred for Fourth Amendment purposes:

> An arrest or seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . ." A show "of official authority such that 'a reasonable person would have believed he was not free to leave'" indicates that an arrest has occurred. "Examples of circumstances that might indicate a seizure, even when the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir. 1989) (additional quotations and citations omitted).

The burden of proving that consent was given freely and voluntarily is on the government. *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). To prove consent, the following must be found:

> (1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

> (2) The government must prove consent was given without duress or coercion, express or implied.

*Id.*

9

*United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017) may not be fully applicable because it involved an analysis of consent in which officers were "approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions [or] by putting questions to him if the person is willing to listen." That is certainly not similar to what happened to Mr. Eaton and his father on August 4, 2025. However, the *Hernandez* list of non-exhaustive factors for "determining whether a reasonable person would feel free to terminate his encounter with the police" may nevertheless be helpful:

(1)    the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;

(2)    whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes;

(3)    whether their weapons are displayed;

(4)    the number, demeanor and tone of voice of the officers;

(5)    whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and

(6)     whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Hernandez*, 847 F.3d at 1264 (numbered and formatted for easy reference).

The fact that Mr. Eaton had support from his father would ordinarily weigh in favor of consent because Mr. Eaton was not alone on his front porch facing the multiple law enforcement officers. This ordinarily favorable factor, however, is

nullified by the fact that the officers had already overborne Scott Eaton's will by commanding him to call Mr. Eaton to the front porch. Scott Eaton found the agents insistent, scary, and intimidating.

*Hernandez* Factor # 4 weighs heavily against a finding of consent. The entire unannounced encounter was obviously orchestrated to maximize intimidation, which touches on *Hernandez* Factors ## 2, 3, and 4. Scott and James Eaton were aware that several officers were present along with Agent Theede. They were all in uniform, wearing body armor, and they all appeared to have holstered service firearms. Several vehicles were parked in the Eatons' driveway and in the street. All of these facts weigh in favor of a finding that this was not a consensual encounter.

*Hernandez* Factor # 6 is strongly in favor of a finding that the August 4, 2025 encounter was not consensual. Agent Theede's demeanor and words conveyed that it was mandatory for Mr. Eaton to answer questions. Agent Theede never advised Mr. Eaton that he could refuse consent. He never advised Mr. Eaton that he could terminate the encounter at any time. He never advised Mr. Eaton that he had the right to an attorney before he answered any questions.

V.    Mr. Eaton's refusal to answer questions during the August 4, 2025 encounter may not be mentioned at trial.

The government summary of the August 4, 2025 encounter states that "EATON did not apologize for making the post and seemed to show no remorse on his intention to incite harm/ hurt ICE agents and Law Enforcement officials carrying

11

out their duties." Exhibit A. Mr. Eaton's refusal to answer questions that apparently were trying to coerce him into apologizing for his posts should not be mentioned at trial.

While Mr. Eaton was never advised of his *Miranda* rights, he obviously invoked his right to remain silent by refusing to provide this information to the government in these two instances. His refusal should not be mentioned before the jury pursuant to *Doyle v. Ohio*, 426 U.S. 610 (1976).

In *Doyle*, the United States Supreme Court held that it is a violation of due process for the government to use a defendant's invocation of the right to remain silent against them at trial. When a defendant chooses to exercise their right to remain silent pursuant to *Miranda*, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618.

Recently, in *United States v. Kee*, 129 F.4th 1249 (10th Cir. 2025), the Tenth Circuit held that the government violated the defendant's due process rights under *Doyle* when it used his post-*Miranda* silence to impeach him. In *Kee*, the Circuit found plain error and reversed when the government asked the defendant during cross-examination why "he had not spoken about his side of the story until his testimony at trial." *Id.* at 1252. The government then emphasized Mr. Kee's silence during closing arguments. *Id.* The Court held the defendant's substantial rights were violated and reversed his conviction. *Id.* The Tenth Circuit has also held that *Doyle* extends to

partial silence when a defendant chooses to tell officers about some aspects but remains silent about others. *See United States v. Ward*, 135 F.4th 1265, 1270 (10th Cir. 2025); *United States v. Canterbury*, 985 F.2d 483, 485 (10th Cir. 1993) (holding that "partial silence [did] not preclude [the defendant] from claiming a violation of his due process rights under *Doyle*").

In Mr. Eaton's case, even if this Court were to find that his affirmative statements made during the August 4, 2025 encounter were admissible, his failure to answer questions about "apologizing" or his feelings about his posts may not be used against him. His silence, or his partial silence, may not be commented upon at trial.

VI.    The same principles should be applied to exclude any statements Mr. Eaton made in connection with his arrest on November 25, 2025.

At the Detention Hearing, Agent Gionta testified that Mr. Eaton did not give passwords for the devices that were seized on November 25, 2025 pursuant to a warrant. Detention Hearing Transcript, Dkt. #28, p. 42. The same principles that were applied above to the August 4, 2025 encounter should be applied to any statements Mr. Eaton made in connection with Mr. Eaton's refusal to provide his password to his phone after his arrest on November 25, 2025. He was arrested, and he had not been advised of his *Miranda* rights. He nevertheless invoked them in refusing to give his passwords. Any statements made should be suppressed due to the Miranda violation and because they were not voluntary. Finally, *Doyle* should be

applied so that any silence, partial silence, or refusals to answer questions should not be mentioned at trial.

VII.    This Court should allow supplementary briefing after the suppression hearing.

The facts will be developed at a suppression hearing. Mr. Eaton understands that this Court would prefer to have briefing before the suppression hearing on all possible issues. However, it is impossible to anticipate what evidence will be elicited at the suppression hearing. Mr. Eaton therefore requests that the parties be allowed to submit post-hearing briefs addressing the total record before the Court.

Conclusion

Mr. Eaton respectfully requests that this Court set this Third Motion to Suppress for hearing, allow post-hearing briefing, and ultimately grant this Motion and suppress all of the statements of Mr. Eaton that were made at the time of the August 4, 2025 encounter and his arrest on November 25, 2025.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Scott Graham, Federal Public Defender

By: s/ *Barbara L. Woltz*
    Barbara L. Woltz, OBA No. 12535
    Assistant Federal Public Defender
    112 N. 7th St.
    Muskogee, Oklahoma 74401
    Telephone: (918) 687-2430
    Counsel for the Defendant

14

## CERTIFICATE OF SERVICE

I certify that on the 27th day of April, 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s): **Terry Cameron McEwen**.

*s/ Barbara L. Woltz*